UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
JOHN HALE,

                                    Plaintiff,

        -v-                                            9:08-CV-612

JADOW RAO; J. IRELAND; MACK REVELL;
R. FURNIA; J. SILVER; JOHN DOEs (2); and
JANE DOEs (4),[1]

                                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                                OF COUNSEL:

JOHN HALE
Plaintiff, Pro Se
03-A-2533
Attica Correctional Facility
Box 149
Attica, NY 14011

HON. ERIC T. SCHNEIDERMAN              RICHARD LOMBARDO, ESQ.
Attorney General of the               Asst. Attorney General
  State of New York
Attorney for the Defendants
Department of Law
The Capitol
Albany, NY 12224

DAVID N. HURD
United States District Judge

---

[1] In their motion documents, defendants clarify the names of the defendant corrections officers as: John Ireland, Mark Reyell, Raymond Furnia, and James Silver.  Accordingly, these names will be used in this order.

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

Plaintiff John Hale ("plaintiff" or "Hale"), a New York state prison inmate proceeding pro se and in forma pauperis, commenced this action on March 19, 2008, pursuant to 42 U.S.C. § 1983 and alleges that defendants—11 employees of the New York Department of Correctional Services ("DOCS")—violated his Eighth Amendment rights. Plaintiff seeks monetary damages. On March 30, 2010, defendants moved for summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure.[2] Defendants claim that the complaint should be dismissed as against defendants Ireland, Furnia, Reyell, Silver, and Rao because Hale failed to exhaust his administrative remedies. Defendants further argue that defendant Rao must be dismissed because he is entitled to qualified immunity and Hale received sufficient medical care.

Plaintiff's response in opposition to defendants' motion fails to mirror defendants' statement of material facts and does not include a formal memorandum of law. Instead, plaintiff has filed a series of letters and affidavits generally opposing summary judgment and requesting that he be appointed counsel. See Dkt. Nos. 63–65, 67–74. Plaintiff's failure to respond in strict adherence to Local Rule 7.1 is not fatal to his claims. Courts often attempt to find some parity between the moving and opposing documents when a pro se party is involved. See Johnson v. Connolly, No. 9:07-CV-1237, 2010 WL 2628747, at *2 (N.D.N.Y. June 25, 2010) (McAvoy, J.); Brown v. Artus, 647 F. Supp. 2d 190, 199

---

[2] Defendants previously moved for dismissal of the complaint in its entirety pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(c). This motion was granted in part and denied in part. Plaintiff's claims for money damages against defendants in their official capacities were dismissed. However, the motion to dismiss defendant Rao on the basis of qualified immunity was denied. See Hale v. Rao, No. 9:08-CV-612, 2009 WL 3698420 (N.D.N.Y. Nov. 3, 2009).

(N.D.N.Y. 2009) (Peebles, M.J.).  It is clear from Hale's papers that he contests facts and opposes defendants' motion for summary judgment.  Further, Hale is illiterate, has a documented low level of intelligence, and is proceeding pro se.  Therefore, the facts, inferences, and arguments will be gleaned from his complaint, deposition testimony, letters and affidavits in opposition, and other pertinent documents in the record.

## II.  FACTUAL BACKGROUND

At all relevant times plaintiff was, and remains, a prisoner in the custody of DOCS. In his complaint, plaintiff claims that while housed at Downstate Correctional Facility ("Downstate") in 2003, he purposely ingested ten to 20 surgical staples.[3]  These staples remained inside plaintiff's body.

### A.  The Excessive Force

On the morning of May 17, 2006, plaintiff was allegedly assaulted by defendant corrections officers Ireland, Reyell, Furnia, and Silver at the Clinton Correctional Facility ("Clinton").  Plaintiff claims that defendant Ireland cursed at him and punched him in the face after plaintiff asked for his medications.  However, the Inmate Injury Report characterizes the incident as an assault on staff, and Hale reportedly explained:  "I ask CO for my meds as I was coming in door.  CO stated fuck off and I hit CO."  Lombardo Decl., Ex. B, at 227.  After the initial contact with Ireland, plaintiff fell to the floor.  The remaining defendant corrections officers then responded and began restraining/assaulting plaintiff, who was soon handcuffed.

---

[3] In his complaint, plaintiff alleges that he was "viciously beaten" by corrections officers at Downstate in 2003 and did not receive proper medical care for injuries he sustained.  However, none of the defendants here were involved in the 2003 events, which are not part of this litigation.  These facts are included only as background to explain the presence of staples in Hale's stomach in 2007.  However, it is not certain that he actually swallowed the staples at Downstate in 2003.  Plaintiff's medical records indicate that he also claimed to have swallowed the staples in 2006 and further asserted that corrections officers "left metal in him" following a prior assault.  See Lombardo Decl., Dkt. No. 62–9, Ex. B, at 175, 183.

Hale sustained injuries to his face and mouth, and some of his teeth were knocked loose. His left shin was "split open" in two places when one of the officers hit him with a wooden baton, and he received a wound in his upper chest/shoulder when one of the officers stabbed him with a key. Plaintiff's shin was swollen and tender, and required ten sutures. Hale was unable to bear weight on this leg.

After receiving a medical evaluation in the infirmary, plaintiff was placed in the Special Housing Unit ("SHU") for several days before being moved to the Mental Health Unit ("MHU"). Plaintiff was charged with assaulting staff and found guilty after a disciplinary hearing. Plaintiff claims that he did not appeal this ruling because he cannot read or write.

### B. The Deliberate Indifference to Medical Needs

Following the incident, plaintiff was treated by the medical staff at Clinton. The treatment included x-rays, and on May 24–25, 2006, medical staff re-evaluated his leg injury, cleaned the wound, and provided pain killers. On June 5–7, 2006, plaintiff complained that his leg wound was opening up and not healing properly. Medical staff noted that Hale had removed some sutures himself, and new dressings were applied. On June 9, 2006, plaintiff was again evaluated by medical staff who documented "some swelling" above his left foot and noted that it appeared that plaintiff had been "picking" at his wound. The wound was cleaned and redressed, and he was advised not to pick at the area. On June 10, 2006, plaintiff complained that he had not received any medical treatment since the May 17 incident. The treating staff noted that he had been evaluated on at least seven different days since the incident. The staff also indicated that plaintiff had a healing abrasion on his upper left arm, a small open area with two sutures on his lower left leg, and a missing tooth. There

were no signs or symptoms of infection at that time.  Plaintiff began the process of being

transferred out of Clinton on June 9, 2006.

Plaintiff was transferred to Southport Correctional Facility ("Southport") on June 12,

2006.  The very next day he again complained that he had not received any medical

treatment since May 17, 2006, and claimed that his feet were green.  The medical staff noted

that there were no deformities on his feet, and the wounds on his left shin and left upper arm

were healing well with no signs of infection.  On June 19, 2006, plaintiff took an excessive

amount of Ibuprofen and was taken to an outside medical facility.  On June 23, 2006, plaintiff

was taken to the infirmary after he attempted to hang himself by tying a shoestring around

his neck.  Staff noted that Hale was "babbling," his sentences made no sense, and he

claimed to have metal in his stomach.  Plaintiff was evaluated by a clinician at the Central

New York Psychiatric Center ("CNYPC") on June 29, 2006.

On June 30, 2006, he advised staff that he again wanted to hang himself.  Plaintiff

was evaluated by medical staff who noted that he had picked the scabs off his left leg,

claimed to have rubbed feces in these wounds, and refused to take his mental health

medications.  Plaintiff was advised to wash out his wounds, and he was referred for mental

health services and placed on suicide watch.  On July 21, 2006, plaintiff made an emergency

sick call because he had stuck an office staple into the top of his left foot.  Medical staff

removed the staple, cleaned the area, and described the injury as "superficial."  During this

exam, the staff noticed a scarred-over wound on plaintiff's lower right abdomen.  Plaintiff

claimed that he had inserted a paper clip into this part of his body, which was hard to the

touch.  The wound did not cause plaintiff any pain and was not open or infected.  Hale would

not tell the staff how long ago he had inserted the paper clip. He was again referred for mental health services.

Thereafter, plaintiff was transferred to Elmira Correctional Facility ("Elmira"), where he was evaluated by a radiologist on October 3, 2006. The radiologist found no evidence of facial fractures. The following day plaintiff was referred to an outside cardiologist for an evaluation following an episode of tachycardia. The evaluation took place on October 18, 2006, and revealed no problems or abnormalities.

In late November 2006 plaintiff was transferred to Attica Correctional Facility ("Attica"), where Dr. Rao acted as Health Services Director. On November 21, 2006, plaintiff complained of severe pain in his mouth, for which he was given Motrin and referred for dental services. On January 24–26, 2007, plaintiff was seen by medical staff and claimed that he had foreign bodies inside his abdomen that had not been removed during a previous surgery. Hale complained of abdominal pain, claimed that metal was protruding from his stomach, and noted that he had not been able to eat for eight days. He was evaluated during these visits, but the medical providers did not observe any signs of metal protruding from his abdominal area. Nonetheless, plaintiff was referred to a physician, and x-rays were ordered. On January 27, 2007, plaintiff was evaluated by Dr. Laskowski, who admitted him to the infirmary for observation. During his four-day stay in the infirmary, plaintiff refused meals and complained that he could not keep any food down, but staff did not observe any vomiting. A January 29, 2007, x-ray showed a foreign body in a superficial area of Hale's abdomen and did not pose a danger of causing further harm.

In February 2007 plaintiff was moved back to the CNYPC for five months, during which he had one staple surgically removed from his abdomen while two others simply "popped out."

Plaintiff then returned to Attica, where he again came under the care of Dr. Rao. On August 6, 2007, an x-ray of plaintiff's abdomen showed metallic foreign bodies. Plaintiff was given a tetanus shot on that date. On August 17, 2007, plaintiff was admitted to the infirmary for observation after he complained of nausea that he claimed was related to the metal in his stomach. An x-ray indicated that these objects had not moved since the prior x-ray. On August 21, 2007, Dr. Rao referred plaintiff for a surgical consultation, which he underwent on September 20, 2007. An October 2, 2007, x-ray report noted that a staple "lies within the superficial skin of the right lower abdomen." On November 30, 2007, plaintiff had x-rays that again revealed multiple metallic foreign bodies in his abdomen. On December 28, 2007, Dr. Rao referred plaintiff for another surgical consult, which took place on January 17, 2008. After this consultation, Dr. Rao referred Hale to an outside medical facility to have the foreign bodies surgically removed. This surgery was done on February 25, 2008.

After this surgery 12 surgical staples were placed over the incision, and Hale remained in the infirmary at Attica and was monitored by Dr. Rao and other medical staff. Plaintiff's dressings were changed regularly, and he was given various medications for pain and other complaints. Plaintiff was discharged from the infirmary on February 29, 2008, as his surgical incision showed no signs of infection. Plaintiff was agreeable with being discharged, and he was instructed on how to care for his wound. On March 6, 2008, medical staff removed the surgical staples. The following day plaintiff reported that the surgical site "opened" after he bent over backwards, and he was again admitted to the infirmary for

observation.  The medical report shows no signs of infection, and the site was cleaned and redressed.  Plaintiff denied feeling any pain in his abdomen, and he was reminded not to do any stretching or lifting.  On March 8, 2008, plaintiff was observed putting his finger inside the wound and was instructed not to do so again.  On March 13, 2008, plaintiff was discharged from the infirmary with instructions on how to care for his healing wounds.

A March 24, 2008, x-ray showed only one metallic foreign body remaining in his abdomen.  On April 14, 2008, plaintiff complained that he had two pieces of metal in his right hip.  Plaintiff's right hip was x-rayed on April 28, 2008, and the film showed no signs of foreign bodies under the skin.

### C.  The Grievances Filed

Plaintiff filed his first formal grievance at Attica on August 2, 2007, complaining of inadequate medical treatment related to the metal staples in his abdomen.  On August 24, 2007, the Superintendent denied this grievance, and plaintiff appealed.  In an October 17, 2007, letter, the Central Office Review Committee ("CORC") upheld the determination of the Superintendent and noted that a staple that was manually removed from the top layer of Hale's skin was "superficial" and had not been ingested.  This letter also indicated that the treating physician determined that the other staples did not need to be removed immediately and that plaintiff had received a tetanus shot and was scheduled for a consultation with a general surgeon.

Plaintiff's second grievance at Attica was filed on August 15, 2007, and again involved the treatment for metal pieces in his abdomen.  The Superintendent denied this grievance as Hale was not in acute distress.  Hale appealed, and in a letter dated October

17, 2007, the CORC upheld the Superintendent's determination and maintained that plaintiff was receiving appropriate medical care.

On October 2, 2007, plaintiff filed a third grievance at Attica complaining of inadequate treatment related to an abscess in his gums.  On December 5, 2007, the CORC again upheld the Superintendent's determination and noted that plaintiff was a "no show" for a scheduled dental appointment, which was rescheduled.

Hale filed his fourth grievance at Attica on February 5, 2008, and alleged that he had been denied medical care for his left leg injury.  The Superintendent denied this grievance after pointing out that plaintiff had been seen by nurses on February 4–5, 2008, and a clinician on February 8, 2008.  Moreover, plaintiff had been prescribed an antibiotic, lab tests were ordered, and x-rays were taken.

## III.  DISCUSSION

### A.  Summary Judgment Standard

The entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509–10 (1986).  A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law."  Anderson, 477 U.S. at 248, 106 S. Ct. at 2510; see also Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248, 106 S. Ct. at 2510.

When summary judgment is sought, the moving party bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the claim.  Anderson, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4. The failure to meet this burden warrants denial of the motion.  Id.  In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.  Id. at 250, 106 S. Ct. at 2511; Fed. R. Civ. P. 56(e).

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. Jeffreys, 426 F.3d at 553.  Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted); see also Anderson, 477 U.S. at 250, 106 S. Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").  Finally, when a party seeks summary judgment against a pro se litigant, the non-movant must be afforded special solicitude.  See Sealed Plaintiff v. Sealed Defendant No. 1, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, . . . a court is obliged to construe his pleadings liberally.'" (quoting McEachin v. McGuinnis, 357 F.3d 197, 200 (2d Cir. 2004)).

**B. Exhaustion of Remedies**

Defendants seek summary judgment of the excessive force claim against defendants Ireland, Reyell, Furnia, and Silver based on Hale's failure to exhaust available administrative remedies.[4]

Pursuant to the Prison Litigation Reform Act of 1995 ("PLRA"), an inmate is required to exhaust all administrative remedies before bringing an action regarding prison conditions. 42 U.S.C. § 1997e(a). This exhaustion requirement applies to all suits concerning prison life, including those alleging excessive force. Porter v. Nussle, 534 U.S. 516, 532, 122 S. Ct. 983, 992 (2002). A plaintiff must exhaust all available remedies even if the prison grievance system cannot provide the specific type of relief sought, i.e. money damages. Id. at 524, 122 S. Ct. at 988; Booth v. Churner, 532 U.S. 731, 741, 121 S. Ct. 1819, 1825 (2001).

In order to satisfy the exhaustion requirement, a plaintiff must complete the administrative review process in accordance with the applicable procedural rules of the facility, appealing decisions to the highest administrative level provided for in the process before bringing suit in federal court. Neal v. Goord, 267 F.3d 116, 122 (2d Cir. 2001), overruled on other grounds, Porter, 534 U.S. 516, 122 S. Ct. 983. Informal complaints to prison officials do not constitute proper exhaustion. Macias v. Zenk, 495 F.3d 37, 44 (2d Cir. 2007) (citing Woodford v. Ngo, 548 U.S. 81, 95, 126 S. Ct. 2378, 2388 (2006), which overruled prior Second Circuit case law allowing for less than "proper exhaustion"). Putting prison officials on notice of the underlying substantive allegations through informal channels

---

[4] Defendants make no argument regarding the substantive merits of the excessive force claim.

is an insufficient substitute for procedurally exhausting all available administrative remedies. See id. at 43–44 (holding that an inmate did not satisfy the PLRA's exhaustion requirement by filing two administrative tort claims and numerous informal complaints). This is so because "'the benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance' and 'the prison grievance system will not have such an opportunity unless the grievant complies with the system's critical procedural rules.'" Id. at 44 (quoting Woodford, 548 U.S. at 95, 126 S. Ct. at 2388).

The Second Circuit has held that although the PLRA requires proper exhaustion, certain exceptions apply. Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006). The three categories of exceptions that excuse mandatory exhaustion include where: (1) administrative remedies are not available; (2) defendants have waived the affirmative defense of failure to exhaust or acted in such a manner as to estop them from asserting the defense; and (3) "special circumstances" justify the plaintiff's failure to exhaust, such as a "reasonable misunderstanding" of the grievance procedures. Id. Defendants have been estopped from asserting the exhaustion defense where threats made by prison staff prevented plaintiff from filing a grievance. Macias, 495 F.3d at 45. The defense is also subject to estoppel where plaintiff was denied grievance forms or writing materials. See Ziemba v. Wezner, 366 F.3d 161, 162–63 (2d Cir. 2004) (per curiam). Grievance procedures may be deemed unavailable "where plaintiff is unaware of the grievance procedures or did not understand [them] or where defendants' behavior prevents plaintiff from seeking administrative remedies." Murrary v. Palmer, No. 9:03-CV-1010, 2010 WL 1235591, at *5 (N.D.N.Y. Mar. 31, 2010) (Suddaby, J.).

Clinton had an Inmate Grievance Program ("IGP") in place at all times relevant to this action. This IGP was in compliance with DOCS Directive 4040, which required an inmate to file a formal grievance within 14 days of the incident.[5] Brousseau Decl., Dkt. No. 62–6, Ex. C, at 6. The alleged assault occurred on May 17, 2006. Plaintiff remained at Clinton until at least June 9, 2006. Although there is no grievance in the record pertaining to this incident, Hale claims that an unidentified inmate wrote a grievance for him immediately after the incident while he was housed in the SHU. Lombardo Decl., Ex. A, at 137. However, he maintains that this grievance was thrown away by staff, who also threatened to assault him if he attempted to file grievances. Id. at 137–39. After spending four days in the SHU after the incident, plaintiff was transferred to the MHU where staff denied his request for a pen to write a grievance. Id. at 132–33. Plaintiff attempted to file a grievance concerning the alleged assault when he arrived at Attica in November 2006, but it was rejected as untimely. Id. at 134–35; Struebel Decl., Ex. E.

Moreover, plaintiff—who has a documented IQ of 71, has been characterized as having "mild mental retardation," dropped out of school during seventh grade, and cannot read or write—was unaware of the grievance procedures. See Dkt. No. 5 (June 29, 2006, and February 6, 2007, progress notes from CNYPC). In his deposition, Hale stated that he "had no idea" that he had 14 days in which to file a grievance following the alleged assault and had never filed a grievance before in his life. Lombardo Decl., Ex. A, at 130. Further evidencing his lack of familiarity with the IGP, Hale noted that he "thought you can't write no

---

[5] This requirement was amended on July 12, 2006, by another DOCS directive that extended the deadline to 21 days of the incident. Struebel Decl., Dkt. No. 62–7, Ex. D, at 6; see also N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(a)(1).

grievances against medical." Id. at 147–48.  Hale also claimed that he did not appeal his

disciplinary decision or fill out a sick call slip because he was illiterate.  Id. at 82, 125.

Resolving any ambiguities and drawing all inferences in a light most favorable to

plaintiff, his failure to exhaust administrative remedies will be excused.  Prison staff threw out

a grievance filled out by another inmate on Hale's behalf, refused to provide him with the

materials needed to file another grievance, and threatened to physically assault him if he

attempted to utilize the IGP.  Additionally, Hale's illiteracy and poor understanding of the IGP

rendered the grievance procedure unavailable.

Accordingly, defendants' motion to dismiss the claims against Ireland, Reyell,

Furnia, and Silver for failure to exhaust administrative remedies will be denied.  As

defendants make no argument regarding the merits of the excessive force claim, it will

remain for trial.

### C.  Eighth Amendment—Deliberate Indifference

Claims that prison officials have disregarded an inmate's medical needs fall under

the umbrella of protection from the imposition of cruel and unusual punishment afforded by

the Eighth Amendment.  Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 291 (1976).

While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate

inhumane treatment of those in confinement.  Farmer v. Brennan, 511 U.S. 825, 832, 114 S.

Ct. 1970, 1976 (1994) (citing Rhodes v. Chapman, 452 U.S. 337, 349, 101 S. Ct. 2392, 2400

(1981)).  Prison officials must "ensure that inmates receive adequate food, shelter, and

medical care, and must take reasonable measures to guarantee the safety of inmates."  Id.

(quoting Hudson v. Palmer, 468 U.S. 517, 526–27, 104 S. Ct. 3194, 3200 (1984)).

It is well-established that mere disagreement over diagnosis and treatment does not subject the involved prison officials to liability.  Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998).  To show that the medical treatment of a prisoner violated the Eighth Amendment, a plaintiff must prove that the defendants' acts or omissions constituted "deliberate indifference to serious medical needs."  Estelle, 429 U.S. at 106, 97 S. Ct. at 292. Mental illness can constitute a serious medical need.  Langley v. Coughlin, 888 F.2d 252, 254 (2d Cir. 1989).  To satisfy this standard, a plaintiff must establish both an objective and subjective element.  Helling v. McKinney, 509 U.S. 25, 35, 113 S. Ct. 2475, 2481 (1993).

Under the objective prong, it must be shown that the alleged deprivation of medical treatment was "sufficiently serious"—meaning a condition of urgency that may produce death, degeneration, or extreme pain.  Johnson v. Wright, 412 F.3d 398, 403 (2d Cir. 2005) (citing Hemmings v. Gorczyk, 134 F.3d 104, 108 (2d Cir. 1998)).  This involves two separate inquiries.  Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006).  First, it must be asked whether plaintiff was actually deprived of adequate medical care.  Id.  If the prison officials acted reasonably with regard to plaintiff's health risk, they cannot be held liable for an Eighth Amendment violation.  Id.  Second, it must be determined whether the inadequacy in medical care was "sufficiently serious."  Id. at 280.  Where, as here, the alleged inadequacy is in the treatment provided, the seriousness inquiry is narrow and focuses on the delayed or deficient treatment rather than on the prisoner's underlying condition alone.  Id.

Under the subjective prong, the plaintiff must prove that the defendants acted with a "sufficiently culpable state of mind."  Johnson, 412 F.3d at 403 (quoting Chance, 143 F.3d at 702).  This requires proof that the defendants knew of and disregarded an excessive risk

to the plaintiff's health or safety.  Id.; see Farmer, 511 U.S. at 839–40, 114 S. Ct. at 1980 (noting that this standard is analogous to criminal recklessness).

### 1. Medical Needs[6]

Plaintiff maintains that defendants Dr. John Doe #2 and nurse Jane Doe #2—employees at Clinton—failed to provide adequate medical care for the injuries sustained in the alleged assault.  Plaintiff also claims that defendant nurses Jane Doe #3 and Jane Doe #4 ignored his complaints of pain at Southport, defendant nurse Jane Doe #1 refused to treat him at Elmira because the medical staff was "too busy," and defendants Dr. John Doe #1 and Dr. Rao failed to provide adequate treatment at Attica.

Clinton—Dr. John Doe #2 and Nurse Jane Doe #2

As a result of the alleged assault at Clinton on May 17, 2006, Hale sustained injuries to his face, shoulder, and left shin.  He was unable to put weight on his left leg and had to be assisted to the infirmary, where he received ten stitches to repair his shin.  Plaintiff also had teeth knocked loose, damage to his gums, and urinated blood.  Assuming his injuries were sufficiently serious to satisfy the objective prong of the Eighth Amendment analysis, there is no evidence to indicate that any medical providers at Clinton acted with deliberate indifference.

Plaintiff acknowledges that he was evaluated and treated by medical staff in the infirmary at Clinton immediately following the alleged assault.  At that time, Hale received at least ten stitches to close the open wounds on his left shin.  His leg was also x-rayed to

---

[6] Although discovery has ended, plaintiff has yet to specifically identify the John and Jane Does in this action.  In the interest of completeness and to avoid further delay that may result from a motion to amend, plaintiff's Eighth Amendment claims against the unnamed defendants will be addressed.

determine if the bone was fractured.  Lombardo Decl., Ex. B, at 74.  On May 24–25, 2006, medical staff re-evaluated his leg injury, cleaned the wound, and provided pain killers.  Id. at 73.  On June 5–7, 2006, plaintiff complained that his leg wound was opening up and not healing properly.  Id. at 72.  The associated medical report indicates that Hale had removed some sutures himself, and medical staff applied new dressings.  Id.  On June 9, 2006, plaintiff was again evaluated by medical staff who documented that plaintiff had been "picking" at his wound.  Id. at 71.  The wound was cleaned and redressed, and Hale was advised not to pick at the area.  Id.  There were no signs or symptoms of infection at a June 10, 2006, medical exam.  Id. at 70.

Plaintiff fails to explain how this treatment was inadequate.  Further, there are no allegations whatsoever that the medical staff at Clinton refused to treat him or consciously disregarded a known risk to his medical needs.  Therefore, defendants' motion for summary judgment will be granted as it relates to the medical indifference claim against medical staff at Clinton.

### Southport—Nurses Jane Doe #3 and Jane Doe #4

On June 12, 2006, plaintiff arrived at Southport, where various incidents occurred evidencing his mental health issues.  The day after he arrived Hale complained that he had never received medical treatment for his injuries resulting from the May 17, 2006, assault and claimed that his feet were green.  Id. at 68.  Medical staff noted that there were no deformities on his feet and that his other wounds were healing well with no signs of infection. Id.  On June 19, 2006, plaintiff overdosed on Ibuprofen and was taken to an outside medical facility.  Id. at 66–67.  Medical staff attempted to evaluate Hale on June 22, 2006, after a sergeant reported that he was "acting out," but plaintiff refused to communicate with the

evaluator.  Id. at 65.  The next day plaintiff attempted to hang himself and was taken to the

infirmary where an abrasion on his neck was treated.  Id.  Plaintiff was seen by MHU staff,

who noted that he was "babbling," his sentences made no sense, and he claimed to have

metal in his stomach.  Id. at 64–65.  Plaintiff was then transferred to CNYPC but returned to

Southport about one week later.

On June 30, 2006, Hale threatened to hang himself and was evaluated by medical

staff who notified the MHU and placed him on suicide watch.  Id. at 63.  On July 4, 2006, a

nurse noted that Hale had picked scabs off his left leg, claimed to have rubbed feces in his

wounds, and refused to take his mental health medications.  Id.  Plaintiff was advised to

wash out his wounds and was again referred for mental health services.  Id.  On July 21,

2006, plaintiff made an emergency sick call because he had stuck an office staple into the

top of his left foot.  Id. at 62.  The treating medical staff removed the staple, cleaned the

area, and described the injury as "superficial."  Id.  During this exam, the staff noticed a

scarred-over wound on plaintiff's lower right abdomen.  Id.  The wound was hard to the

touch, did not cause plaintiff any pain, and was not infected.  Id.  Plaintiff claimed that he had

inserted a paper clip into this part of his body but would not tell the staff how long ago he had

done so.  Id.  He was again referred for mental health services.

Plaintiff cannot establish that the superficial injury stemming from the staple he

stuck into the top of his foot or the scarred-over self-inflicted wound resulting from the paper

clip he inserted into his abdomen are sufficiently serious conditions.  To the extent that

ingesting an excessive amount of Ibuprofen and tying a shoelace around his neck constituted

serious suicide attempts to satisfy the objective prong of the Eighth Amendment analysis,

Hale does not point to any evidence that the treatment he received was inadequate—much

less the result of deliberate indifference.  Hale merely asserts that nurses "ignored" his complaints.  However, he received immediate treatment for every malady complained of, was referred for repeated mental health evaluations, and was transferred to different facilities for treatment.  Therefore, defendants' motion for summary judgment will be granted as it relates to the medical indifference claim against medical staff at Southport.

Elmira—Nurse Jane Doe #1

In late July 2006 plaintiff was transferred to Elmira.  Hale's entire medical indifference claim relating to the treatment he received at this facility is based on the allegation that a nurse told him that "she can't help him right now, they're too busy." Complaint, Dkt. No. 1, ¶ 19.  Plaintiff fails to identify what serious medical condition he was afflicted with at that time.  The record indicates that on October 3, 2006, he was evaluated by a radiologist who found no evidence of facial fractures.  Lombardo Decl., Ex. B, at 125.  The next day Hale complained of chest pain and dizziness, and medical staff performed an EKG. Id. at 60.  On October 18, 2006, plaintiff was evaluated by an outside cardiologist following an episode of tachycardia.  Id. at 148–49.  The evaluation revealed no problems or abnormalities.  Id.  Plaintiff was seen for an emergency sick call on October 26, 2006, and claimed to be having a heart attack.  Id. at 59.  Another EKG was ordered and Hale remained in the infirmary for overnight observation.  Id.

Assuming plaintiff's cardiac symptoms were sufficiently serious, there is no evidence to support Hale's claim that any of the healthcare providers at Elmira consciously disregarded his medical needs.  The record indicates that he was promptly treated every time he complained of symptoms and was referred to an outside cardiologist for more testing.

Therefore, defendants' motion for summary judgment will be granted as it relates to the medical indifference claim against medical staff at Elmira.

<u>Attica—Dr. Rao and Dr. John Doe #1</u>

Plaintiff claims that at all times he was housed at Attica the treatment he received for the metallic foreign bodies inside his abdomen amounted to deliberate indifference. Plaintiff alleges that the treatment he received was not timely, he was released from the infirmary too quickly after surgery, and his surgical staples were removed prematurely causing his incision to open up.

It must first be determined whether the presence of metallic foreign objects inside Hale's abdomen amounted to a serious medical condition. Plaintiff maintains that these metal objects caused him pain and sporadically resulted in blood in his urine. However, the medical reports suggest that the presence of small metallic objects in his abdominal wall did not pose an imminent threat to plaintiff's health or safety. This is further evidenced by Hale's claim that the staples had remained in his body for several years before causing him discomfort.

As noted in a footnote above, plaintiff has offered various explanations for the presence of the staples in his abdomen. Dr. Rao testified that the metallic objects were located in the "superficial aspect" of plaintiff's abdominal wall, meaning they could not cause substantial damage or affect major organs. Rao Decl., Dkt. No. 62–2, ¶ 15. Dr. Rao opined that the x-rays suggested plaintiff inserted the staples into his abdomen from the outside instead of swallowing them as he claims in the complaint. <u>Id</u>. at ¶ 16. Based on the findings of the various physicians involved in this case and the position of the metallic objects as shown in the x-rays, the only logical conclusion is that plaintiff manually inserted the metallic

objects into his abdomen.  This is plausible in light of plaintiff's admitted history of self-inflicted injuries, including inserting a paper clip into his abdomen and a staple into the top of his foot as well as picking at scabs and placing his finger into surgical wounds.

Dr. Weidun Alan Guo, a surgeon at Erie County Medical Center, evaluated plaintiff on several occasions and determined that the metallic foreign bodies were located in his abdominal wall, not inside his abdominal cavity.  Guo Decl., Dkt. No. 62–3, ¶¶ 11, 16.  Dr. Guo characterized plaintiff's subsequent surgery to remove these staples as "elective" and "non-urgent."  Id. at ¶ 13.  Moreover, Dr. Sallah Abbasey, a physician at Attica, evaluated plaintiff in November 2007 and found a "palpable" metallic foreign body just under the skin in his abdomen.  Abbasey Decl., Dkt. No. 62–5, ¶ 5–6.  Dr. Abbasey removed this foreign body at Hale's request.  Id. at ¶ 12–13.  The medical record shows that these metallic objects did not cause an infection in Hale's abdomen.  In sum, the medical records belie plaintiff's assertion that he suffered from a serious medical condition that, if ignored, would lead to death, degeneration, or extreme pain.

Even assuming, for purposes of this motion for summary judgment, that plaintiff swallowed the staples and thereafter experienced serious medical complications as they protruded from his abdomen years later, there is nothing in the record to support the assertion that Dr. Rao and the medical staff at Attica acted with deliberate indifference.  Indeed, the record indicates that the medical care Hale received was reasonable.

Plaintiff first complained about metal in his abdomen to staff at Attica on January 24, 2007.  Lombardo Decl., Ex. B, at 50.  Medical staff performed a prompt physical exam, which did not reveal any puncture wounds or emergent conditions, and ordered x-rays.  Id.  Hale was admitted to the infirmary for observation on January 27, 2007.  Id. at 49.  An x-ray

taken on January 29, 2007, showed a piece of metal in the outside wall of plaintiff's abdomen, where it would not cause any damage or affect major organs.  Id. at 124a; Rao Decl., ¶ 34.  Hale left Attica in early February 2007.

When Hale returned to Attica in August 2007, he again was admitted to the infirmary after complaining of having metal in his stomach.  Lombardo Decl., Ex. B, at 45.  At that time medical staff manually removed a staple that was lodged in the skin on Hale's abdomen, his abdomen was x-rayed, he received a tetanus shot, and Dr. Rao referred him for a surgical consultation.  Id.  Over the next few months plaintiff's abdomen was x-rayed numerous times, he was referred for more surgical consultations, and Dr. Abbasey removed one staple in the infirmary.  In February 2008, Dr. Guo performed "elective" surgery to remove metallic objects from Hale's abdomen.  Following this procedure, Hale spent several days in the infirmary at Attica before being discharged back to his cell.  Ten days after the surgery, at the order of Dr. Abbasey and in accordance with the instructions of Dr. Guo, the surgical staples were removed.  Abbasey Decl., ¶ 19; Guo Decl., ¶ 20.

Plaintiff's conclusory assertion that he was discharged too early and his staples were taken out prematurely are mere disagreements over the chosen treatment.  There is nothing in the medical record to suggest that the treatment Hale received was improper or caused further harm.  In fact, the records suggest that the surgical site on plaintiff's abdomen reopened only after he bent over backwards and manipulated it with his own fingers.  Lombardo Decl., Ex. B, at 153–54.  This is consistent with other entries in the record in which he engaged in self-mutilation.  Plaintiff never suffered from an infection related to the metal in his abdomen or the surgical procedures he underwent to remove them.

Finally, plaintiff asserts that Dr. Rao called him "crazy" when he claimed to have swallowed staples. However, this falls far short of establishing that Dr. Rao, in turn, consciously disregarded Hale's serious medical needs. On the contrary, as outlined above, Dr. Rao provided a litany of evaluations, tests, referrals, consultations, and treatment. Therefore, defendants' motion for summary judgment will be granted as it relates to the medical indifference claim against Dr. Rao and the medical staff at Attica.

## 2. Conditions of Confinement

Liberally construing plaintiff's complaint, he claims that the conditions of the medical facility at Attica were unsanitary.

In order to satisfy the objective element of this Eighth Amendment claim, "a 'plaintiff must demonstrate that the conditions of his confinement result[ed] in . . . serious deprivations of basic human needs' or deprived him 'of the minimal civilized measure of life's necessities.'" Govan v. Campbell, 289 F. Supp. 2d 289, 296 (N.D.N.Y. 2003) (Sharpe, M.J.) (quoting Anderson v. Coughlin, 757 F.2d 33, 34–35 (2d Cir. 1985)). Basic human needs include "food, clothing, shelter, medical care, and reasonable safety." Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002) (citation and internal quotation marks omitted).

Plaintiff claims that the conditions were unsanitary due to the presence of insects in the room and the fact that medical staff pulled a staple out of his abdomen by hand. However, these bald allegations fall short of establishing a condition-of-confinement claim. There is nothing to suggest that the conditions at Attica prevented Hale from receiving appropriate medical care. Dr. Abbasey testified that he removed a staple from plaintiff's abdomen, at plaintiff's request, under sterile conditions and after administering a local anesthetic. Abbasey Decl., ¶ 13. As noted previously, the medical record indicates that

plaintiff did not suffer from an infection in his abdomen as a result of his treatment for the metallic objects.

Accordingly, any purported claim that the conditions of Hale's confinement at Attica were unsanitary and unsafe will be dismissed.

### F. Qualified Immunity

Defendants have asserted a defense of qualified immunity on the part of Dr. Rao. Since plaintiff cannot establish that Dr. Rao violated his constitutional rights, "there is no necessity for further inquiries concerning qualified immunity." Los Angeles County v. Rettele, 550 U.S. 609, 616, 127 S. Ct. 1989, 1994 (2007) (quoting Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001)).

## IV. CONCLUSION

Plaintiff has failed to establish a genuine issue of material fact concerning his deliberate indifference to medical needs and conditions-of-confinement claims. However, plaintiff's failure to exhaust all available administrative remedies will not bar his excessive force claim, which remains for trial as defendants sought summary judgment on that claim solely on the basis of the exhaustion defense.

Accordingly, it is

ORDERED that

1. Defendants' motion for summary judgment is GRANTED in part and DENIED in part;

2. Plaintiff's Eighth Amendment deliberate indifference to medical needs and conditions-of-confinement claims against defendants Dr. Jadow Rao, John Does and Jane Does are DISMISSED; and

3.  Plaintiff's Eighth Amendment excessive force claim against defendants John Ireland, Mark Reyell, Raymond Furnia, and James Silver is NOT DISMISSED and remains for trial.

IT IS SO ORDERED.

_____
United States District Judge

Dated:   March 8, 2011
         Utica, New York.